1

2

3                    **UNITED STATES DISTRICT COURT**

4                         **DISTRICT OF OREGON**

5                         **PORTLAND DIVISION**

6  MECHELLE DOUGLAS,                     )

7               Plaintiff,               )    No. 03:11-cv-00770-HU
                                         )
8  vs.                                   )
                                         )
9  MICHAEL J. ASTRUE,                    )  **FINDINGS AND RECOMMENDATION**
   Commissioner of Social Security,      )
10                                       )
               Defendant.                )
11
   _____
12

13 Bruce W. Brewer
   Law Offices of Bruce W. Brewer, P.C.
14 419 5th Street
   Oregon City, OR 97045
15
        Attorney for Plaintiff
16

17 S. Amanda Marshall
   United States Attorney
18 Adrian L. Brown
   Assistant United States Attorney
19 1000 S.W. Third Avenue, Suite 600
   Portland, OR 97204-2904
20

21 David Morado
   Regional Chief Counsel
22 Seattle, Region X
   Roberta G. Bowie
23 Special Assistant United States Attorney
   Office of the General Counsel
24 Social Security Administration
   1301 Young Street, Suite A-702
25 Dallas, TX 75202

26      Attorneys for Defendant

27

28

1 - FINDINGS AND RECOMMENDATION

HUBEL, United States Magistrate Judge:

The plaintiff Mechelle Douglas seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying her application for Disability Insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Act. Douglas argues the Administrative Law Judge ("ALJ") erred in finding she has only a "mild" disc herniation and osteoarthritis; failing to identify clear and convincing reasons for his adverse credibility finding; and improperly rejecting lay witness testimony from Douglas's mother. *See* Dkt. ##11 & 27. Douglas requests remand for further proceedings, so her "claims can be evaluated in accordance with the law." Dkt. #21, p. 15.

## I. PROCEDURAL BACKGROUND

Douglas protectively filed her applications for DI and SSI benefits on September 20, 2006, at age 39, claiming a disability onset date of May 2, 2003. (A.R. 18, 99, 104[1]) Douglas claimed she was disabled due to pain and weakness in her neck, back, arms, and legs; "spinal headaches"; muscle spasms; and difficulty holding things. She claimed that due to pain, she could not sleep comfortably, and she had difficulty driving, walking, riding in a

---

[1]The administrative record was filed electronically using the court's CM/ECF system. Dkt. #11 and attachments. Pages of the record contain three separate page numbers: two located at the top of the page, consisting of the CM/ECF number (e.g., Dkt. #11-6, Page 10 of 15); a Page ID#; and a page number located at the lower right corner of the page, representing the numbering inserted by the Agency. Citations herein to "A.R." refer to the agency numbering in the lower right corner of each page.

2 - FINDINGS AND RECOMMENDATION

car, and dressing and bathing herself.  (A.R. 140, 146)  Her
applications were denied initially and on reconsideration.  (A.R.
53-61, 64-68)  Douglas requested a hearing, and a hearing was held
before an ALJ on October 7, 2009.  (A.R. 25-48)  At the hearing,
Douglas amended her alleged disability onset date to March 3, 2006.
(A.R. 18, 28)  On November 4, 2009, the ALJ issued his decision,
finding that although Douglas has severe impairments consisting of
"mild cervical spine disc herniation and cervical osteoarthritis"
(A.R. 20), her impairments do not meet the Listing level of
severity, and she retains the capacity to perform her past relevant
work as a paralegal, receptionist, general clerk, and newspaper
carrier.  The ALJ therefore concluded Douglas was not disabled at
any time through the date of his decision.  (A.R. 18-24)

Douglas requested review, and submitted additional evidence
that was considered by the Appeals Council.  (*See* A.R. 4)  On
April 27, 2011, the Appeals Council denied Douglas's request for
review (A.R. 1-3), making the ALJ's decision the final decision of
the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

Douglas filed a timely Complaint in this court, requesting
judicial review.  Dkt. #2.  The matter is fully briefed, and the
undersigned submits the following Findings and Recommendation for
disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

## II.   FACTUAL BACKGROUND

### A.   Summary of the Medical Evidence

Douglas's amended disability onset date is March 3, 2006.
(*See* A.R. 18, 28)  The administrative record contains medical
evidence beginning almost three years earlier, on May 8, 2003, when

3 - FINDINGS AND RECOMMENDATION

Douglas was seen in the emergency room following a motor vehicle accident.[2]   In making his credibility determination, the ALJ specifically relied on some of these earlier medical records, which Douglas alleges was improper.   Therefore, I will summarize the earlier evidence to put my discussion of the ALJ's credibility findings in context.

The E.R. records from May 8, 2003, show Douglas, an "unemployed paralegal," complained of pain in her neck, right shoulder, and right arm. (A.R. 304)  On examination, the doctor noted muscle spasms and decreased range of motion of Douglas's neck, and weakened grip strength. (*Id.*)   He also noted tenderness in Douglas's right shoulder, elbow, and wrist. (A.R. 305)  X-rays of her right elbow and wrist were negative.   An x-ray of her right shoulder showed "calcific tendinitis," but no other significant abnormality.   An x-ray of her cervical spine showed "degenerative changes at C6-7," with no fractures. (A.R. 302)

On June 25, 2003, Douglas saw chiropractor Robert Johns, D.C. for complaints of neck pain and stiffness, mid-back pain, sleeping problems, and numbness in her fingers, following her automobile accident the previous month. (A.R. 222, 225-29)  From his examination, Dr. Johns diagnosed Douglas with an acute traumatic cervical/ thoracic sprain/strain, with possible nerve root impingement. (A.R. 222)  He noted she might need a cervical MRI to rule out a herniated cervical disc and "possible brachial plexus strain."

---

[2]It is not clear from the record whether Douglas's accident occurred on May 2 or May 8, 2003. *Compare* A.R. 324 *with* A.R. 226. However, from her description of the accident, and the time of day it occurred, it does appear she only had one accident in May 2003, rather than two accidents six days apart. *Id.*

1  (*Id.*)  He performed a "trial" treatment, to which Douglas exhibited
2  "good initial response" with a high degree of pain relief. (*Id.*)
3  Dr. Johns provided Douglas with an "orthopedic support pillow . . .
4  to help relieve pain and reduce likelihood [sic] of exacerbation
5  during rest periods." (A.R. 232)  He prescribed treatment three to
6  four times weekly for one week.  Under "ADL/Work limitations," he
7  noted "Modified Duty." (A.R. 222)

8       Douglas returned to see Dr. Johns the next day, reporting an
9  improvement in her elbow and right arm pain.  She had slept "much
10 better," but was stiff upon awakening.  She had driven from her
11 home in Milwaukee, Oregon, to Beaverton, Oregon, for her job with
12 a temporary service, causing pain to return in her right elbow,
13 upper back, and neck.  She "[h]ad to call for assistance in driving
14 home" due to her increased pain. (A.R. 221)  Douglas rated her
15 pain at 4/10.  Dr. Johns treated Douglas with manual traction,
16 muscle stimulation, and manipulation.  He prescribed a home trac-
17 tion unit, and directed her to use cold packs that night.  He also
18 noted it was still not clear whether Douglas had a herniated disc
19 or a brachial plexus injury. (*Id.*)

20      Douglas saw Dr. Johns again on June 28, 2003.  She complained
21 of increased upper back and neck pain, extending into her right
22 upper arm, and she rated her pain at 6/10.  She reported overall
23 improvement in her pain from her previous treatment, but stated the
24 pain had returned three to four hours later.  Dr. Johns adminis-
25 tered several treatment modalities, and supplied Douglas with an
26 over-the-door traction unit for home use.  He referred Douglas for
27 an MRI study. (*Id.*)

28

5 - FINDINGS AND RECOMMENDATION

1    Douglas returned to see Dr. Johns for followup on July 1,
2  2003.  She was using the home traction unit, which was providing
3  her with mild relief.  She continued to experience moderate pain in
4  the region of her right elbow, right upper back in the area of her
5  shoulder blades, right forearm, and right hand with mild numbness,
6  as well as right arm weakness.  She rated her pain at 3/10.
7  Dr. Johns administered treatment modalities, and noted Douglas was
8  scheduled for an "Open MRI" to determine whether she had a disc
9  herniation.  (A.R. 210)

10    Douglas missed appointments with Dr. Johns on July 3 and 18,
11  2003.  An MRI of her cervical spine was performed on July 10, 2003.
12  Impression from the study was "Disc disease at C5-6 and C6-7 with
13  asymmetry to the annulus bulge.  The cord is displaced slightly at
14  C5-6 and there is narrowing of the left C6 and left C7 neural
15  foramina."  (A.R. 263)  The radiologist included the following note
16  on the MRI report: "Because of the lack of correlation between the
17  side of the pathology and the patient's symptoms, I would recommend
18  correlation with a CT myelogram."  (*Id.*)

19    When Douglas returned to see Dr. Johns on July 24, 2003, she
20  stated she had been ill, preventing her from making her last two
21  scheduled appointments.  Douglas rated her pain at 4/10, with no
22  change in her symptoms.  She continued to have pain in her right
23  upper back, neck, and right arm.  The pain was worse with activity.
24  She continued to use the home traction unit.  She was treated with
25  several modalities, and Dr. Johns reviewed the MRI report with her.
26  He planned to refer Douglas to a neurologist for consultation.
27  (A.R. 219)

28

6 - FINDINGS AND RECOMMENDATION

Douglas returned to see Dr. Johns for followup on July 30 and 31, 2003. Her right arm, upper back, and neck pain were unchanged, and she complained of tingling in her upper arm and into her right hand. She stated her pain ranged from 4/10 to 9/10, and the pain was constant. She was experiencing a "high degree of difficulty" with her normal activities of daily living, driving, working at sedentary jobs, and sitting. On July 30, 2003, she exhibited marked tenderness over the right lateral epicondyle (of the elbow) to light touch. Muscle spasms were noted from C6-T2, and she had decreased strength on the right, although she denied significant weakness. She was treated with several modalities, and was referred to neurosurgeon James Makker, M.D. for evaluation. On July 31, 2003, Douglas reported "significant relief" with manual and mechanical cervical traction. Dr. Johns referred Douglas for physical therapy. (A.R. 218)

On August 4, 2003, Douglas saw Dr. Makker for consultation at Dr. Johns's request. Douglas gave a history of being involved in a motor vehicle accident on May 8, 2003. She complained of neck pain which had progressed to right arm pain and numbness, with little to no symptoms in her left arm. She had "some pain and numbness in the right side of her thoracic back." (A.R. 209) Douglas stated her right arm was becoming weaker than her left arm, and she was having "difficulty opening jars and performing grabbing functions with her right hand." (*Id.*) An MRI scan "revealed disc bulges at C5-6 and C6-7 into the left C6-7 and C5-6 neural foramina[.]" (*Id.*; *see* A.R. 211) Conservative treatment, "including rest, NSAID's, physical therapy modalities, and chiropractic manipulation," had been ineffective. (*Id.*)

7 - FINDINGS AND RECOMMENDATION

1    Dr. Makker noted Douglas's cervical ranges of motion were
2 "limited to 30 degrees on lateral rotation, 60 degrees in flexion,
3 and 20 degrees in extension."[3]   Cervical range-of-motion testing
4 created pain and paresthesia down Douglas's right arm.   She had
5 normal lumbar ranges of motion, and straight leg raising was
6 negative bilaterally.   (A.R. 209-10)   She exhibited decreased
7 sensation "along the lateral arm and into the dorsal forearm on the
8 right side."   (A.R. 210)   She would not allow the doctor "to
9 perform deep tendon reflexes in the right arm as she said this
10 would cause severe pain." (*Id.*)   Dr. Makker noted the radiologist
11 who had performed the MRI scan "recommended correlation with CT
12 myelogram due to the lack of correlation at the site of pathology
13 and the patient's symptoms." (*Id.*)   Dr. Makker agreed, and planned
14 to order a CT myelogram, as well as nerve conduction studies.   The
15 doctor gave Douglas a temporary work release from August 4, 2003,
16 until further assessment, due to "C-Spine injury," noting Douglas
17 was "not medically stationary."   (A.R. 215)

18    Dr. Johns's office left phone messages for Douglas on August
19 9 and 12, 2003, requesting an updated status on her injury.   (A.R.
20 217)   On the 12th, Dr. Johns spoke with Douglas's mother, who
21 indicated Douglas had seen Dr. Makker for consultation.   (A.R. 216)

22

23

24       [3]The Oregon Department of Consumer and Business Services,
25 Workers' Compensation Division has adopted norms established by the
   AMA Guides for spinal ranges of motion.   The norms for cervical
26 range of motion are flexion - 60 degrees, extension - 75 degrees,
   right and left lateral flexion - 45 degrees, right and left
27 rotation - 80 degrees.   *See* http://www.cbs.state.or.us/external/
   wcd/policy/ bulletins/ab_index.html (visited March 28, 2012), form
28 2278c, "Spinal (Cervical) Range of Motion."

8 - FINDINGS AND RECOMMENDATION

On August 18, 2003, Douglas saw Dr. Makker for followup of "severe neck pain and right arm pain and numbness." (A.R. 208) Her symptoms had not changed. Cervical ranges of motion laterally and on extension were unchanged, but she exhibited decreased flexion of 50 degrees. Notes indicate, "Nerve conduction studies reveal a normal ulnar exam. She did not tolerate the median and arm pain examinations." (*Id.*) Dr. Makker noted his impression as, "Severe neck pain and right arm pain and numbness with disc protrusions at C5-6 and C6-7." (*Id.*) He ordered a CT myelogram to allow him to assess which of the disc protrusions was the more symptomatic. (*Id.*)

On October 1, 2003, Dr. Johns noted Douglas had called his office on September 25, 2003, to inquire about further treatment needs. He talked with Douglas on October 1st, and noted Douglas still had not had the CT myelogram Dr. Makker wanted. Douglas now was complaining of pain in her neck and upper back on both sides, and Dr. Johns encouraged her to either come see him or return to see Dr. Makker for further evaluation. (A.R. 216)

On November 14, 2003, Dr. Johns submitted the following report to Disability Determination Services regarding Douglas's treatment:

> Ms. Douglas first reported to my office on June 25, 2003 following a motor vehicle collision that apparently occurred on May 8, 2003. After three treatments, I referred her for a cervical MRI. She returned to my office 23 days later after missing or canceling several scheduled appointments.
>
> On July 24, 2003 I referred her for a neurological consult with James Makker, M.D. She reported to Dr. Makker's office on August 4, 2003. By report, Dr. Makker then advised more diagnostic studies. The last time Ms. Douglas was in my office was on July 31, 2003. At that time, I did not

> perform a functional assessment, but in my opinion, she was having significant problems with sitting, standing, lifting, and carrying and handling objects that include most of her activities of daily living.  I did not see any signs or symptoms of cognitive dysfunction. She drove herself to the clinic and was able to communicate as to the sequence of events since the motor vehicle collision occurred.

(A.R. 233)

There are no records of any treatment, testing, or consultation from August 18, 2003, until April 7, 2004, except the phone call to Dr. Johns on September 25, 2003.  Douglas saw chiropractor Zchon R. Jones, D.C. on April 7, 16, 27, and 28, 2004, for complaints of ongoing pain and muscle spasms in her right arm, elbow, shoulder, neck, and back, arising from her May 2003 auto accident.  She indicated she was experiencing headaches, dizziness, restlessness, insomnia, constipation, coldness in her hands, loss of strength in her arms, pain and/or numbness in her arms/hands, and burning muscle pain.  (A.R. 325)  From his examination, Dr. Jones diagnosed Douglas with a Grade II sprain/strain/tear of the cervical, thoracic, and lumbar spine; and dysfunction/subluxation of the cervical, thoracic, and lumbar joints; with disc herniation at C5-6.  (A.R. 330-32, 326)  She was treated with "Trigger Point Therapy," "Sinewave," "Hydrocollation," "Activator Adjustment," and "Light Massage."  (A.R. 327-29)

On July 6, 2004, Douglas was seen by family practitioner Gregory J. Johnson, M.D., complaining that about a week earlier, she had "felt something move in her neck," causing "pains going down her right arm[,]" with tightness in her right shoulder and neck.  (A.R. 307; *see* A.R. 306)  Douglas described the pain as "a burning, a 'rippling' in her right arm," with pain sometimes

10 - FINDINGS AND RECOMMENDATION

1  radiating into her right leg.  Douglas stated her coverage from the

2  May 2003 auto accident had run out, and her neurologist had

3  "stopped seeing her."  (A.R. 307)  She also complained of a rash,

4  and stated that when she had pain, she would pick at the skin on

5  her hands and thighs.  On examination, the doctor noted the

6  following:

> Cervical range of motion shows rotation is
> full but she winces somewhat dramatically when
> she reaches extreme of each movement.  Exten-
> sion is 25°, flexion 25°, again patient winces
> with each movement.  She winces when I do her
> Tinel sign at her wrist.  She winces when I
> touch her right arm virtually at all.  Deep
> tendon reflexes are symmetric with biceps and
> brachial radialis are 1/4, triceps 1/4.  Motor
> exam is difficult to fully assess as I have
> some concern about the patient having full
> cooperation with the right.  When distracted,
> she seemed to go 5/5, response somewhat
> decreased on the right, but again difficult to
> assess whether this was full effort.  Tinel is
> positive on the right, according to the
> patient.  Again response to this was somewhat
> dramatic.  Ulnar Tinel is also positive on the
> right.  The patient has numerous excoriations
> over her dorsal hands, lower arms.  I do not
> see any other primary lesions.

18  (*Id.*)  Dr. Johnson's impressions were: (1) "Cervical spasm, right

19  arm pain.  Most of her cervical findings are on the left.  On her

20  previous MRI, it is difficult to assess fully as I do not think I

21  had a completely objective exam."; and (2) "Neurodermatitis."

22  (*Id.*)  He prescribed an antihistamine for her itching, Baclofen

23  muscle spasms, and Ibuprofen 800 mg. four times daily for pain.  He

24  recommended Douglas follow up with a primary care physician.  (*Id.*)

25      Douglas had an MRI scan of her cervical spine on March 5,

26  2005, on referral from neurologist Gajanan Nilaver, M.D.  (A.R.

27  256-57)  The radiologist's impressions from the study were:

28

11 - FINDINGS AND RECOMMENDATION

1        1. Mild, fairly broad posterior C5-6 disc herniation, most prominent in the left para-central region, mildly indenting the thecal sac and slightly deforming the spinal cord, similar to the previous study.

        2. Minimal to mild posterior disc bulging and osteophytosis at other levels, mildly indent-ing the thecal sac but not touching the spinal cord.

        3. Encroachment on neural foramina as described above, most prominent on the left C5-6 neural foramen.

        4. Degenerative disc disease, moderate at C5-6 and C6-7 and mild elsewhere in the cervical spine.

(A.R. 257)

Again, there are no records of evaluation or treatment for a year. On March 5, 2006, Douglas saw sports medicine specialist Lisa Burton, M.D. at a Kaiser Permanente ("Kaiser") urgent care clinic for neck and back pain arising from a new motor vehicle accident on March 3, 2006. Douglas stated she was "t-boned" on the driver's side of her vehicle. (A.R. 370-71) She stated pain, predominantly in her left arm and shoulder, was preventing her from getting comfortable at night. On examination, Douglas was tender on the left scapula and back of her shoulder. She had pain with neck motion, with lateral rotation and tilting at 50% of "expected," but was more comfortable with flexion. However, the doctor noted neck motions were "present with conversations." (A.R. 371) The doctor prescribed Flexeril for muscle spasms, and Vicodin and Motrin for pain. She also prescribed an arm sling for Douglas's left arm, to be used only when she was having pain in her arm. Douglas was directed to use her arm "as comfortable," and to use "ice for pain and inflammation," "stretching and light

12 - FINDINGS AND RECOMMENDATION

1  activities," and "relaxed pace walking."  (A.R. 371)  She also
2  received a cervical collar, but was advised to use it only for a
3  short term of a day or two, and not to drive while wearing the
4  collar.  (*Id.*)  Dr. Burton gave Douglas a work release for "Desk
5  and paper work and light work only" through March 12, 2006, noting
6  Douglas was not to do overhead work, reaching, lifting, or "power
7  use with arms."  (A.R. 383)  The doctor further noted that if no
8  light work was available, then Douglas should be off work for that
9  time period, and Douglas would be released for regular duty on
10 March 13, 2006, "if improved.  If not sufficiently improved then
11 recheck recommended."  (*Id.*)

12      Instead of returning to Dr. Burton, Douglas saw Dr. Johns on
13 March 22, 2006, in connection with her recent automobile accident.
14 She stated she had been in the process of parking when a drunk
15 driver hit her.  She suffered bruising to her shoulder, and
16 complained of pain and stiffness in her neck, headaches, dizziness,
17 sleeping problems, numbness in her fingers, jaw pain, tingling in
18 her arms, and photosensitivity. (A.R. 243-44)  Dr. Johns diagnosed
19 her with acute traumatic cervical/thoracic sprain/strain with "disc
20 related syndrome w/radiculopathy."  (A.R. 242)  He treated Douglas
21 with traction, muscle stimulation, and other therapies, and noted
22 she showed a "good initial response" to treatment.  (*Id.*)  He
23 prescribed ice packs two to three times daily, and chiropractic
24 treatment two to three times a week, with reevaluation in six to
25 eight weeks.  He also prescribed massage therapy two to three times
26 per week for three to four weeks. (A.R. 245)  He directed Douglas
27 to stay off work for fourteen days.  (A.R. 242; A.R. 288)
28

13 - FINDINGS AND RECOMMENDATION

Douglas saw Dr. Johns for followup on March 23, 2006.  She complained of pain and weakness in her left arm, and bilateral neck and upper back pain that was "burning" in nature, and she rated her pain at 7/10.  She reported mild improvement from her treatment the previous day, and mild relief using cold packs.  She was treated with several modalities, and directed to continue using the cold packs.  (A.R. 241)

When Douglas returned to see Dr. Johns on March 24, 2006, she still had pain, but reported less intensity.  She complained of a lot of muscle spasms in her upper back.  She rated her pain at 7/10.  She was treated with manual traction, muscle stimulation, and manipulation, and was directed to return in two to three days. (*Id.*)

Dr. Johns saw Douglas on March 28, 2006, for followup.  She stated her symptoms had improved immediately following treatment, but then became worse after a day or so.  She reported her pain level at 8/10.  She stated her bilateral neck pain worsened with head movement.  She still had radicular pain in her left arm, and tingling in the last three fingers of her left hand.  She was responsive to treatment, and was directed to continue using cold packs to reduce inflammation.  The doctor also prescribed use of a home traction device "to reduce disc compression."  (A.R. 240)

Douglas next saw Dr. Johns on March 30, 2006.  She continued to complain of pain on the left side of her neck with radiculopathy, although she stated the pain was less intense, rating it at 6/10.  She also complained of left elbow pain.  Manual cervical traction improved her pain.  Some of the doctor's notes are illegible, but it appears he found cervical muscle spasms

14 - FINDINGS AND RECOMMENDATION

indicating "acute nerve compression." (A.R. 274) He treated Douglas with chiropractic modalities and indicated she showed a "good response" to treatment. (*Id.*)

Douglas saw Dr. Johns on April 1, 2006. She continued to complain of tingling in the outer three fingers of her left hand. She also complained of bilateral numbness in her arms upon awakening, and difficulty being up and walking. She rated her pain at 6/10. On examination, she exhibited tenderness over her bilateral upper trapezius muscles. (Additional progress notes are illegible.) The doctor prescribed cervical traction with a home over-the-door unit, and "passive-active stretches." (A.R. 275) He noted Douglas's response to treatment was "fair," and he recommended she get a neurological consultation. He directed her to stay off work for seven additional days. (*Id.*; A.R. 285)

At her next visit on April 3, 2006, Douglas told Dr. Johns she was getting some relief from her treatment. She exhibited mild to moderate tenderness on palpation (presumably of her upper back); "hypertonicity" of her upper arms; and some restricted movement of her spine. She also complained of left elbow pain. She rated her pain overall at 7/10. (A.R. 276)

On April 4, 2006, Douglas saw Dr. Johns, and reported she was "having continued pain in both sides of [her] upper back, left arm and shoulder." (A.R. 277) She felt a burning pain in her left deltoid region. She rated her pain at 6/10. Her pain improved with manual traction, as her cervical spine became decompressed, but she still had marked pain in her cervical spine. The doctor prescribed cervical traction, and Douglas was instructed on the procedure. (*Id.*)

15 - FINDINGS AND RECOMMENDATION

1      Douglas saw Dr. Johns on April 6, 2006, for followup.  She was
2  using the cervical traction unit twice daily for ten minutes each
3  time, and she reported "good relief" while she was on the traction
4  unit and for about an hour afterward.  She reported a flareup in
5  her mid back the previous day when she was not on the traction
6  unit.  Douglas stated her pain worsened with deep breathing.  She
7  continued to have muscle spasms in her trapezius muscles with
8  "noted spinal joint exudation," and pain bilaterally in the
9  trapezius muscles, left shoulder girdle, and mid back.  She was
10 directed to continue the cervical traction and passive-active
11 stretches.  (A.R. 278)  The doctor gave Douglas a work release
12 dated April 8, 2006, for seven days, indicating she was scheduled
13 for reevaluation on April 15, 2006.  (A.R. 287)

14     On April 26, 2006, Douglas saw Dr. Johns and reported ongoing
15 left arm numbness, and bilateral upper back and neck pain.  She
16 rated her pain at 8/10.  She had seen a medical doctor a week
17 earlier, and the doctor had prescribed a course of oral steroids.
18 Douglas had a "bad reaction" to the medication and discontinued it.
19 On examination, Dr. Johns noted marked tenderness in Douglas's
20 trapezius muscles, cervical compression at C4-6 "reproducing [left]
21 upper extremity [symptoms], and "sacral joint restrictions."  (A.R.
22 279)  He ordered an MRI "to assess for worsening nerve compres-
23 sion."  (*Id.*)  He directed Douglas to use cold packs.  (*Id.*)  He
24 gave Douglas a work release for thirty days beginning April 15,
25 2006, noting she was scheduled for reevaluation on May 19, 2006.
26 (A.R. 286)

27     Douglas saw Dr. Johns on June 2, 2006.  She stated she had
28 fallen and hurt her right knee, resulting in surgery.  She reported

16 - FINDINGS AND RECOMMENDATION

1  a "new accident" three days earlier, but no details are given
2  regarding the nature of the accident.  She rated her current pain
3  at 9/10.  On examination, Douglas exhibited "sharp shooting pain"
4  into her upper back, radiating into her fingers.  Other findings
5  are illegible.  The doctor referred Douglas for an "open MRI" to
6  assess her cervical compression, and noted Douglas needed a
7  neurological consultation.  He also noted Douglas continued to be
8  off work, and he gave her a work release for thirty days beginning
9  May 15, 2006, noting she was scheduled for reevaluation on June 15,
10  2006.  (*Id.*; A.R. 289)

11      The MRI of Douglas's cervical spine was scheduled for June 6,
12  2006; however, Douglas called and canceled the exam because she was
13  unable to remove a brace that had been placed on her leg following
14  her knee surgery.  She stated she would call to reschedule when she
15  could remove the brace.  (A.R. 254)  The exam apparently was
16  rescheduled for July 5, 2006, but Douglas's boyfriend called and
17  canceled this MRI, stating Douglas had to cancel "due to personal
18  reason."  (A.R. 252)

19      On September 5, 2006, Douglas saw internal medicine specialist
20  and pediatrician Nazhat F. Taj-Schaal, M.D. at Kaiser for followup
21  of her ongoing left upper back and shoulder blade pain.  The
22  doctor's impression upon examination was "Cervical radiculopathy
23  with loss of strength."  (A.R. 369)  The doctor refilled small
24  amounts of each of Douglas's medications, directing her to get
25  established with a new doctor who could provide medications for her
26  on an ongoing basis.  (A.R. 370)  Douglas was referred for physical
27  therapy, x-rays, and an MRI.  (A.R. 368-69)

28

17 - FINDINGS AND RECOMMENDATION

1    Douglas saw family practitioner Ariane I. Wolf, M.D. at Kaiser
2  on October 12, 2006, for followup of chronic left neck pain with
3  radiation down left arm, numbness and tingling down her left arm,
4  and weakness.  Douglas indicated surgery had been recommended after
5  her 2003 accident, but she lost her insurance and did not have the
6  surgery.[4]  She stated her chiropractor had advised her to see a
7  medical doctor, noting she might have a displaced left posterior
8  rib.  On examination, the doctor noted Douglas had mildly decreased
9  range of motion of her neck in all directions, and moderate
10 tenderness down the trapezius muscles into the rhomboids on the
11 left.  She had pain with abduction of the left shoulder above
12 forty-five degrees, and mildly decreased sensation down her entire
13 left arm.  The doctor diagnosed Douglas with chronic left neck
14 pain/radiculopathy, and cervicalgia.  Her medications were
15 refilled, including Flexeril, Ibuprofen, and Vicodin.  (A.R. 360)
16 Douglas was given a work release for purposes of "Physical
17 therapy/rest/medication" through October 26, 2006.  (A.R. 382)

18    On October 23, 2006, physical medicine and rehabilitation
19 specialist Martin Kehrli, M.D. reviewed the record and completed a
20 Physical Residual Functional Capacity Assessment form.  (A.R. 293-
21 300)  He opined Douglas would be able to lift ten pounds frequently
22 and twenty pounds occasionally; sit, and stand/walk, each for about
23 six hours in an eight-hour workday, and push/pull without restric-
24 tions.  He indicated she could climb ladders, ropes, and scaffolds,
25 and crouch and crawl occasionally; and perform all other postural
26 activities frequently.  He noted Douglas's ability to reach in all

27

28    [4]The court's review of the Record has failed to reveal any
doctor's recommendation that Douglas have this surgery.

18 - FINDINGS AND RECOMMENDATION

directions was limited, but her handling, fingering, and feeling abilities were unlimited.   In Dr. Kehrli's comments, he noted Douglas "would have functional limits" secondary to degenerative disc disease of the cervical spine, but he opined she would not be limited in standing, walking, or sitting, as Douglas alleged.  He further noted her examination of September 2006 indicated she had normal grip strength, contrary to Douglas's allegation that she has problems handling.   He indicated her ability to lift "could be impacted, but she has normal neurovascular exam, which suggests her limits would not preclude all work."  (A.R. 300)   He therefore found Douglas's subjective complaints not to be fully credible. (*Id.*)

Douglas saw family practitioner Elaine Marcus, M.D. at Kaiser on October 27, 2006, for followup of her cervicalgia.   Douglas indicated she had been off work since her motor vehicle accident in March 2006.  She requested a continuation of her work release, and medication refills.  She complained of ongoing neck pain, with radiation and numbness in her left arm.  Douglas's work release was continued through November 17, 2006.  (A.R. 382)  Her medications were continued without change, and an MRI was ordered.  She was advised to establish care with a new permanent primary care physician, "or consider seeking care outside of [Kaiser] as she [was a] non-member."  (A.R. 359)

Douglas saw a physical therapist on November 3, 2006.  She stated her left shoulder was feeling better, but the left shoulder blade was very painful.  Douglas was doing home exercises three times daily as directed for her shoulder.  She estimated her current pain at 8/10.  She had a good response to treatment,

19 - FINDINGS AND RECOMMENDATION

feeling immediate relief with a TENS unit, and she was able to raise her arm higher than when the therapy began.  (A.R. 412)

Douglas saw a physical therapist on November 15, 2006.  She reported having a lot of pain in the left thoracic region for a few days, and not sleeping well.  Her TENS unit helped "some."  She had a fair response to the physical therapy treatment, with "slight irritation" remaining in the left thoracic region.  (A.R. 409)

On November 16, 2006, Douglas saw internal medicine specialist Michael Ferrell, M.D. at Kaiser, for followup of her neck pain radiating into her left arm.  Douglas also complained of "left mid back pain in paraspinous muscle area . . . worse with breathing." (A.R. 358)  On examination, Douglas's neck ranges of motion were 60 degrees extension, 50 degrees flexion, right rotation of 70 degrees, and left rotation of 30 degrees.[5]  She had trigger points in her left trapezius muscle, and the paraspinous muscle of her left mid back.  Notes indicate an MRI had shown degenerative joint disease with no herniated discs.  The doctor administered a left mid back trigger point injection that provided "rapid relief of pain in that area, including resolution of pain . . . caused by breathing."  (Id.)  Douglas's Vicodin prescription was refilled. She was directed to follow up for further injections as needed. (Id.)  The doctor gave Douglas a work release through December 17, 2006, noting she would be released for regular work on December 18, 2006.  (A.R. 385)

On November 22, 2006, Douglas saw a physical therapist at Kaiser for treatment.  She responded fairly well, continuing to

[5]See note 3, supra.

20 - FINDINGS AND RECOMMENDATION

exhibit tightness and tenderness at the T6-T12 level.  (A.R. 407)
Douglas saw a physical therapist on December 1, 2006.  Douglas had
good tolerance for the exercises, and was "slowly progressing."
(A.R. 405)   Notes indicate future visits would concentrate on
increasing the strength in Douglas's left shoulder rotator cuff,
and increasing her left shoulder range of motion.  (*Id.*)

On December 18, 2006, Douglas saw Physician's Assistant
H. Keith Ferguson at Kaiser for followup of her ongoing neck and
left shoulder/arm pain.  She reported increased pain when she had
reached out to open a drawer a few days earlier.  She exhibited
muscle tension and tenderness along the upper trapezius on the
left, and in the cervical paraspinal muscles on the left.  (A.R.
357-58)   She was diagnosed with "Sprain or Strain of Cervical
Spine."   (A.R. 357)    She was given a work release through
December 29, 2006, with release "for regular work duties on 12-30-
06."  (A.R. 381)  Progress notes do not indicate what treatment was
provided at this visit.

Douglas saw Dr. Marcus again on January 2, 2007, for followup
of ongoing neck and mid-back pain.  Her work release was extended
through January 22, 2007, and she received refills of her
medications.  (A.R. 357, 380)

On January 22, 2007, Douglas saw physical medicine and reha-
bilitation specialist Paul O. Jacobs, M.D. at Kaiser for a consul-
tation "at the request of Howard Ferguson in Urgency Care for
evaluation of her neck problems."  (A.R. 356)  Douglas gave a
history of two motor vehicle accidents, with the earlier accident
causing symptoms on the right side of her neck and right arm, while
the more recent accident had caused symptoms on her left side.  At

21 - FINDINGS AND RECOMMENDATION

the time of this evaluation, she was "experiencing discomfort around the upper back and just underneath the armpit with breathing on the left side, and her neck [was] painful. She ha[d] reduced ability to sleep, and she [got] intermittent aching pain radiating down into the brachium[.]" (*Id.*) Douglas was taking Flexeril (a muscle relaxant), Ibuprofen, and hydrocodone, and was using a TENS unit. She stated she had been unable to work since her March 2006 accident, describing her job as "auto detailing SUVs," requiring "a significant amount of neck, shoulder, and upper extremity use." (*Id.*) Notes indicate Douglas displayed "no pain behavior during her physical examination or her interview." (*Id.*) She had full range of motion of her cervical spine, but exhibited pain "at the end of left rotation and with combined movements of extension, left rotation, and left side bending[.]" (*Id.*) The doctor noted muscle tension in Douglas's neck, especially on the left side, and Douglas was "tender to palpation around the medial border of the scapula." (*Id.*) Dr. Jacobs diagnosed Douglas with "chronic arthritic and disc changes" at the C5-6 and C6-7 level, "with neural foraminal narrowing at the C5-6 level on the left side." (*Id.*) He noted Douglas had "a component of myofascial pain," and he administered a trigger point injection. He referred her to a pain clinic for a cervical epidural steroid injection. He also refilled Douglas's medications. (*Id.*) He gave Douglas a work release for "1/22/07 through 3/15/06 [sic]." (A.R. 379)

On March 3, 2007, Douglas saw a nurse practitioner at Kaiser for a complaint of long-standing painful upper thoracic vertebra since her auto accident in March 2006. Douglas was requesting refills of pain medication and muscle relaxant. She was diagnosed

22 - FINDINGS AND RECOMMENDATION

with cervicalgia.  (A.R. 354-55)   The progress note suggests medications were prescribed, but the precise medications and dosages are not listed.  (*See* A.R. 355)

On March 22, 2007, Douglas saw pain management specialist Suzanne C. Zarling, M.D. at Kaiser with complaints of ongoing "severe left neck, shoulder, and upper arm pain with occasional radiation down her whole arm with numbness," in connection with her accident of March 3, 2006.  (A.R. 353-54)  Douglas described her pain as "hot and sensitive to touch," and noted that bending forward caused a severe headache, dizziness, and achiness.  (A.R. 354)  Douglas stated she had been treated with "physical therapy, chiropractic exercises, heat, ice, rest, pain medications, [and a] TENS unit," none of which had provided any permanent relief.  (*Id.*) She stated her pain caused her problems "with sleep, and enjoyment of life and activities[.]"  (*Id.*)  Dr. Zarling noted the following examination findings:

> [Douglas] is an alert, pleasant lady.  She is about 5 foot 3 inches, 170 pounds.  Her neck has pain at the left trapezius with flexion and extension and lateral rotation to the side. Her shoulder range of motion is normal. She has some winging of the scapula with lowering her shoulders to her side.  Her neck has some tenderness to palpation in the trape-zius muscles, but no specific trigger points palpated.  There is normal color, normal tem-perature.  Pulses are full and equal.  Skin is warm with good capillary refill.  Her grip strength is equal.  She has decreased biceps strength on the left side compared to the right, and deep tendon reflexes are equal. Her sensation is intact to light touch.  She is also tender to palpation along the medial border of the left scapula.

(*Id.*)  The doctor diagnosed Douglas with "Left neck pain with radicular versus complex regional pain syndrome of the left arm and

23 - FINDINGS AND RECOMMENDATION

1  neck, and myofascial pain." (*Id.*)  She recommended Douglas return

2  for an epidural injection.   She also prescribed a trial of

3  Neurontin (gabapentin). (*Id.*)

4       On April 19, 2007, Douglas saw Dr. Zarling, and received a

5  cervical epidural steroid injection. (A.R. 352-53)

6       On June 19, 2007, Douglas underwent an MRI examination of her

7  cervical spine, as ordered by Dr. Marcus.   The study showed

8  possible "nearby arthritis" at the C1-2 level, but "no abnormality

9  of the craniocervical junction"; "Minimal endplate spondylytic

10 disease" at the C3-4 level, with "no disk protrusion or spinal

11 stenosis"; and no remarkable findings at C2-3, C4-5, or C7-T1.

12 Remarkable findings were noted as follows:

13            C5-6 level: Advanced asymmetrical degenera-
            tive disk disease is note.  This consists of disk
14            space narrowing, endplate spondylytic disease,
            and asymmetrical disk bulging.  The combina-
15            tion of these findings is resulting in bilat-
            eral neural foraminal narrowing worse on the
16            left.  There is narrowing of the AP diameter
            of the spinal canal to the left of midline by
17            approximately 30%.  The underlying cervical
            cord, however, is not directly contacted.
18
            It should be noted that there is reversal of
19            the upper cervical curvature centered at this
            same level.
20
            C6-7 level: Asymmetrical cervical disk disease
21            is noted.  This consists of asymmetrical
            endplate spondylytic disease and some disk
22            bulging.  This is starting to result in bilat-
            eral neural foraminal narrowing.  The degree
23            of neural foraminal narrowing, however, is not
            as severe as at the level above.  There is
24            some narrowing of the AP diameter of the
            spinal canal, but no more than 20%.
25
26 (A.R. 364)

27      An x-ray of Douglas's cervical spine the same day showed

28 "[r]ather prominent osteoarthritic degenerative changes involv[ing]

24 - FINDINGS AND RECOMMENDATION

the lower cervical vertebral bodies," with demonstrated foraminal encroachment. (A.R. 365) X-rays of her chest and left ribs were normal. (A.R. 366)

On October 17, 2007, family practitioner Richard Alley, M.D. reviewed the record in connection with Douglas's request for reconsideration. (A.R. 374-75) He noted Douglas "basically states that she cannot do much of anything [without] pain, can walk [only] 5-10 min." (A.R. 375) He found "many discrepancies with [Douglas's] allegations and the objective findings. [She] tends to have dramatic presentation during exams, she started out [with right] arm pain and numbness and after a second accident, it changes to the [left] arm. She had [decreased range of motion] of the neck on exam, but none when talking to the [doctor]. [Her] Statements of functional limitations cannot be found fully credible." (*Id.*) He affirmed the initial assessment that Douglas would be capable of light work with limitations. (*Id.*)

Douglas saw Dr. Zarling for cervical epidural steroid injections on April 19, August 23, and December 28, 2007. (A.R. 376-78) She received another injection on February 7, 2008, and the doctor noted Douglas was doing better after the injection, although she still had a "pinch" in the mid-thoracic area that could radiate to her left shoulder blade and left thumb. (A.R. 387) The doctor recommended followup physical therapy and possibly a thoracic level MRI. (*Id.*)

On May 16, 2008, Douglas saw family practitioner Mindi Robinson, M.D. at Providence Medical Group ("Providence") to establish care as a new patient for routine medical care. Among other complaints not related to her disability claim, Douglas stated she

25 - FINDINGS AND RECOMMENDATION

1 had "5 slipped discs" in her neck from a 2006 motor vehicle
2 accident.  She was having regular steroid injections until she lost
3 her insurance.  She currently was having pain and numbness in her
4 left arm, and a "spot in back that easily is aggreveted [sic] with
5 movement."  (A.R. 423)    She requested refills of Neurontin
6 (gabapentin) and Motrin (Ibuprofen), and the medications were
7 refilled.  (A.R. 423-24)  On examination, her neck was noted to be
8 "supple."  (A.R. 424)

9        Douglas saw Dr. Robinson at Providence for followup on
10 September 4, 2008.  She reported pain with movement of her left
11 arm, and when wearing a seatbelt.  Since her last trigger point
12 injection, she was having paresthesias down her left arm.  She
13 complained of frequent muscle spasms in her back, and a pinching
14 feeling in her mid-back.  Lifting and bending both caused flares of
15 pain at that point.  The pinching feeling radiated out to her side,
16 and up into her left shoulder. Use of a TENS unit helped somewhat.
17 Douglas reported taking 800 mg. of Ibuprofen as needed for pain,
18 and she was taking Neurontin 300 mg. three times daily.  She had
19 never tried a higher dose of Neurontin, but was willing to do so,
20 and the doctor prescribed 600 mg. tablets three times daily.  A
21 repeat MRI was ordered.  (A.R. 430-31)  In addition, the doctor
22 prescribed another course of physical therapy for Douglas's neck
23 and shoulder pain, noting Douglas had felt this was helpful for her
24 in the past.  (A.R. 432)

25        An MRI study of Douglas's thoracic spine was done on
26 September 22, 2008.  The study showed a "[s]mall left paracentral
27 disc protrusion" at T7-8, but otherwise was unremarkable.  (A.R.
28 433)  The images also showed a portion of the cervical spine, which

26 - FINDINGS AND RECOMMENDATION

showed "cervical kyphosis[6] with probable degenerative spondylosis and possible cervical disc disease, most prominent at C5-6 level." (*Id.*)

Douglas saw Dr. Robinson at Providence on October 10, 2008, with a complaint of knee pain after falling the previous evening. She stated she was walking through a door, tripped over the threshold, and landed on both knees on concrete. She complained that knee pain had kept her awake overnight, and she had pain at her left kneecap when she tried to lift that leg. The doctor noted a small abrasion on Douglas's left knee, mild swelling, and a moderate limitation of flexion. Douglas was limping on the left and "unable to relax guarding" to allow a full knee exam. The doctor recommended limited weight bearing for one week. She ordered an x-ray to rule out fracture, and prescribed a limited course of Percocet to use at night for sleep. She also recommended Douglas take Ibuprofen as needed, use ice on her knee, and elevate her leg. (A.R. 435) X-rays were negative for any fracture or misalignment. (A.R. 436)

Six months later, on April 28, 2009, Douglas saw Dr. Robinson at Providence with a complaint of back pain. Notes indicate Douglas had twisted her back a few days earlier, and it "felt like something popped out that she cannot get to go away." (A.R. 437) To the right of the painful spot, she felt tingling and numbness. Douglas was still taking Neurontin 600 mg. three times daily,

---

[6]"Kyphosis is a curving of the spine that causes a bowing or rounding of the back, which leads to a hunchback or slouching posture." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002220/ (visited 07/24/12).

27 - FINDINGS AND RECOMMENDATION

Ibuprofen 800 mg. every eight hours for pain, and Percocet every six hours as needed for breakthrough pain.  The doctor prescribed Flexeril, and noted if Douglas's back pain had not improved in two weeks, she would need physical therapy.  (A.R. 437-38)

On June 10, 2009, Douglas saw family practitioner Tanya Lubkin, D.O. at Providence for chronic back pain.  She stated she recently had fallen on her knees, felt something "jolted" in her back, and was experiencing increased pain and "twitching" in the area.  She also had numbness in her right knee and her big toe, as well as ongoing chronic neck pain and left arm numbness from her 2006 motor vehicle accident.  She continued to take Neurontin and Ibuprofen for pain. On examination, Douglas exhibited no vertebral, paravertebral, or costovertebral angle tenderness.  Her pain was in the right rhomboid muscle.  The doctor noted Douglas was "difficult to examine as she moves and jerks constantly for my exam."  (A.R. 439)  Dr. Lubkin advised Douglas that her pain was "most definately [sic] muscle related," and her best treatment options "would be Acupuncture [sic] or massage[.]"  (A.R. 440)  However, Douglas requested muscle relaxants, and Flexeril was prescribed for a short term.  (*Id.*)

Douglas saw Dr. Robinson at Providence on June 25, 2009, for a complaint of hip pain.  Douglas was taking Percocet 5-352 mg. every six hours for severe pain, Flexeril 10 mg. up to three times daily for muscle spasm, and Ibuprofen 800 mg. every eight hours. Douglas stated she had fallen earlier in the month at the river front.  Her description of the fall differed from that given to Dr. Lubkin.  She now described bruising her palms, and hitting her chin and right knee.  Her leg pain had increased since the fall to

28 - FINDINGS AND RECOMMENDATION

the point that she could not pick up her toes, and her lower leg was "completely numb." (A.R. 445)  She had pain from her right hip to her toes down the outside of her leg, and she was having difficulty driving due to pain and weakness in her leg.  On examination, she had full strength and hip flexion on both sides, and 4/5 knee flexion and extension on the right.  Although Douglas reported right hip pain with extension rotation and internal rotation, her range of motion of both hips was equal.  The doctor expressed concern that the new radicular symptoms on the right could indicate some nerve impingement.  She prescribed physical therapy and a short course of pain medication, noting if Douglas's symptoms did not improve, neuroimaging might be appropriate. (A.R. 446)

Douglas saw Dr. Robinson at Providence for followup on September 11, 2009.  Douglas stated she had been unable to do the physical therapy the doctor had ordered in June, because when Douglas called her insurance company about the treatment, she was told it would not be covered.  She continued to have pain and muscle cramping in her back and right leg.  She had to change positions frequently, which gave her brief relief, and she was unable to drive due to her leg pain.  She also had paresthesias in the big toe of her right foot.  Douglas's hip ranges of motion were normal, but she reported significantly increased pain with all movements on the right, especially right knee flexion.  Heel and toe walking were painful, although she was able to do them slowly, with somewhat awkward balance.  She evidenced a mild limp on the right.  Dr. Robinson noted Douglas's insurance coverage limited the available treatment options.  The doctor recommended "typical

29 - FINDINGS AND RECOMMENDATION

conservative therapy" of medication and physical therapy, followed by an MRI if there was no improvement, but she was unsure what insurance would cover.  (A.R. 459-60)

It appears Douglas obtained approval for some physical therapy because the record contains notes showing a series of exercises prescribed by a physical therapist on October 14, 2006.  (A.R. 462-63)  An MRI of Douglas's lumbar spine was done on December 17, 2009, that was unremarkable for any abnormalities.  (A.R. 464)

Douglas saw Dr. Robinson on July 16, 2010, for a complaint of back pain after someone had run into her at the grocery store, causing her to fall backwards onto the floor.  (A.R. 473-74) Douglas complained of "severe pain with every breath" in her mid-back, where she had a previous injury.  She also complained of neck pain.  She was unable to find a comfortable position, and noted that since the injury, she had been experiencing more frequent paresthesias in her right hand.  On examination, there were "no clear radicular findings."  (A.R. 474)  The doctor prescribed Flexeril and a limited course of Percocet, and directed Douglas to continue taking Ibuprofen for pain.  (*Id.*)

Prescription records indicate Douglas continued to take Ibuprofen 800 mg., Flexeril 10 mg., and Neurontin (gabapentin) 600 mg., regularly throughout 2009 and 2010; and she also took Percocet in December 2009, and July, October, and December 2010. (A.R. 456-58, 466-69)

/ / /

/ / /

/ / /

/ / /

30 - FINDINGS AND RECOMMENDATION

## B.  Vocational Expert's Testimony

The VE noted Douglas has worked as a legal assistant/para-legal, which is rated as light level work with an SVP of 7[7]; a receptionist, which is a sedentary-level job with an SVP of 4; a nursery school attendant, light-level work with an SVP of 4; kindergarten teacher for a private Christian school, a light-level job with an SVP of 7; general clerk, a light-level job with an SVP of 3; and newspaper carrier, light-level work with an SVP of 2. (A.R. 45)

The ALJ asked the VE to consider an individual of Douglas's age, with a G.E.D. and Douglas's work history, who is "limited to light exertional level activities, able to occasionally stoop, crouch, crawl, kneel, and climb[, and] [o]ccasionally reach over-head." (A.R. 46)  The VE stated this individual would be able to return to all of Douglas's past jobs except the kindergarten teacher, which would require more than occasional stooping, crouching, and kneeling in order to be at the children's level. (*Id.*)

The VE stated that if an individual had the limitations described by Douglas in her testimony, the individual would be

---

[7]In the VE's description of Douglas's past relevant work, he classifies jobs with an "SVP," or level of "specific vocational preparation" required to perform certain jobs, according to the *Dictionary of Occupational Titles*.  The SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or. Dec. 7, 2011) (Simon, J.) (citation omitted).  "The DOT identifies jobs with an SVP level of 1 or 2 as unskilled, jobs with an SVP of 3 or 4 as semi-skilled, and jobs with an SVP of 5 or higher as skilled." *Whitney v. Astrue*, slip op., 2012 WL 712985, at 3 (D. Or Mar. 1, 2012) (Brown, J.) (citing SSR 00-4p).

31 - FINDINGS AND RECOMMENDATION

unable to work.  He noted Douglas "explained how she has to lay down quite a bit during the day, needs family members to obviously help her with activities of daily living[,]" which would prevent her from being "able to be at work on time, . . . and do what she has to do for eight hours a day, five days a week."  (A.R. 46-47)

### C.  Douglas's Testimony

#### 1.  Hearing testimony

At the start of the ALJ hearing, Douglas amended her alleged onset date to March 3, 2006, the date of her second motor vehicle accident.  According to her attorney's statements at the hearing, Douglas had begun recuperating from her 2003 accident, and had even returned to part-time work, before she had the second accident in March 2006.  (A.R. 28)

Douglas was 42 years old at the time of the hearing.  She has a G.E.D.  She is divorced, and at the time of the hearing, she was living with her 20-year-old daughter in a travel trailer on her parents' property.  (A.R. 29-30)

Douglas stated her March 3, 2006, accident occurred when she was "hit by a drunk driver."  (A.R. 30)  She has not worked or earned any money since the accident.  She has problems with her left arm, neck, and back, with her worst problem being back pain. (A.R. 30-31)  She also has right leg pain which, according to her, is "associated with [her] back."  (A.R. 31)  She has numbing, tingling, and "a burning sensation that runs from [her] hip all the way down to [her] . . . big toe[.]"  (Id.)  When she puts pressure on her right leg, it feels like her leg is "dislocated" or "disjointed or something."  (A.R. 31-32)  She can walk, but it causes

32 - FINDINGS AND RECOMMENDATION

her pain, and she has difficulty pressing the gas pedal to drive. (A.R. 32)[8]

For pain and muscle cramps, Douglas takes 600 mg. of Neurontin three times a day, Ibuprofen 800 mg. three times a day, and Flexeril in the evening. (A.R. 31)  She has not had surgery, noting that at one point in late 2006 or early 2007, a doctor discussed possible surgery with her, but Douglas lost her insurance and was unable to follow up with that recommendation.  (A.R. 32)

Douglas is able to bathe and dress herself, but sometimes she needs help pulling shirts over her head or zipping things up.  She does light cooking and uses a microwave.  If her daughter is home, her daughter will do the cooking.  Douglas's mother and daughter help with the laundry.  (A.R. 32-33, 41-42)  Douglas sometimes can help gather clothes together, fold dry clothes, or put a load in the washer or dryer, but these activities cause her "a great deal of pain." (A.R. 33, 40-41)  She shops occasionally, but only buys a few things at a time.  (*Id.*)

On a typical day, Douglas spends a lot of time resting in bed. She sometimes watches television, and occasionally reads, but most of the time, she listens to music.  She has a bed at her parents' home so she can visit with them and still spend time lying down. She has a couple of other relatives she sees about once a week. Her only source of income is food stamps.  Her parents cover her other expenses, such as the electricity for her trailer. (A.R. 33-34)

---

[8]Again, the court finds nothing in the Record to corroborate Douglas's statement that a doctor discussed possible surgery with her.

33 - FINDINGS AND RECOMMENDATION

Douglas stated the heaviest thing she can lift without pain is a gallon of milk. She estimated she can sit for up to an hour before she has to change position. If she keeps pressure off her right leg, she can stand for thirty minutes to an hour. Ordinarily, she can walk for thirty minutes to an hour, but this time has been reduced due to her leg problems. (A.R. 34-35)

Douglas spends a great deal of time lying down to relieve the pressure in her back. She stated pressure builds up in her mid-to-upper back, causing her arms to swell,[9] her neck and upper back to hurt, and headaches. When her left arm swells and hurts, she gets "hot spots" in her upper back and neck, and gets "really bad spinal headaches." (A.R. 35-36) She gets muscle spasms, which usually respond to the Flexeril. (A.R. 37) She has tried Percocet for breakthrough pain, but she does not "do really well" on the medication because it makes her "really nauseous." (A.R. 37) She also gets bad nausea on Vicodin, so when she has to take it for pain, she generally takes only half a tablet, waits awhile, and then takes the other half. (A.R. 37-38) The Neurontin she takes makes her very drowsy. Flexeril also makes her drowsy, so she usually takes it only at night. (A.R. 38)

Douglas has problems falling asleep and staying asleep. It usually takes her one to two hours to fall asleep, and she will sleep for no more than two-and-a-half hours before waking up again due to pain, numbness in her hands, or general discomfort. She

[9]The court has located no evidence in the Record to indicate Douglas ever complained about left arm swelling to any of her treating sources, or that any treating source ever made such a finding on objective examination.

34 - FINDINGS AND RECOMMENDATION

1 usually is awake for about an hour before she can fall asleep
2 again.   As a result of this disturbed sleep pattern, she is
3 fatigued and restless throughout the day.  She estimated she spends
4 four to five hours each day lying down.  (A.R. 38-40)  She uses
5 circular pillows under her neck and arm, and large pillows to take
6 pressure off her back.  (A.R. 40)

### 2.  Written testimony

On June 18, 2007, Douglas completed a Function Report-Adult. She described her daily activities as sleeping, watching a little TV, maybe reading a little, and sitting around.  (A.R. 163)  She indicated that due to her impairments, she is no longer able to hold her grandchild for long periods, drive, or sleep well.  She has a hard time falling asleep, and she awakens at night with numbness and pain.  She requires help putting on a bra and shirts, bathing her back and neck, fixing the back of her hair, and sometimes using the toilet.  (A.R. 164)

She prepares her own meals, but cereal is her "main meal" because it is "easy." (A.R. 165)  She does very little housework, and then only for short periods of time, and others help her with housework when she is in pain.  (*Id.*)  She seldom goes out, but when she does, she walks or rides as a passenger in a car because driving causes her too much pain, makes her sick, and gives her headaches. (A.R. 166)  She goes shopping only for her basic needs. She does not enjoy shopping because it is "too painful," and gives her headaches.  (*Id.*)  She is able to handle her own money and pay her own bills.  (*Id.*)

1    Douglas indicated her only leisure activities are reading and
2  watching TV, which she can only do for short periods of time before
3  she has to change positions due to pain.  She has ceased all other
4  hobbies due to chronic pain.  She occasionally goes to church, but
5  keeps to herself to prevent showing her pain to others.  (A.R. 167)

6    Regarding her physical limitations, Douglas stated she cannot
7  lift anything with her left arm.  She cannot sit for longer than
8  five minutes before she has to change position.  She has to move
9  her neck often to get comfortable.  She can walk five to ten
10 minutes until it becomes painful, and then she has to rest for five
11 to ten minutes.  She can maintain attention and concentration for
12 ten to twenty minutes at a time.  She often does not finish what
13 she starts due to pain.  She has no problem following oral and
14 written instructions, but she loses interest quickly because she is
15 distracted by her pain.  (A.R. 168)  She gets along with authority
16 figures.  She stated frequent changes in routine help her keep her
17 mind off of her pain.  (A.R. 169)

18    Douglas also completed a Pain Questionnaire.  She indicated
19 she has chronic pain that is "aching, burning, stick pins, numbing,
20 buzzing, sharp [and] hard to breath[e]."  (A.R. 171)  The pain
21 occurs in her neck, back, and along her left arm.  The pain never
22 goes away completely; it only changes in intensity, depending on
23 her body positions and postures.  She has pain on lifting her head,
24 bending over, changing her movements, lifting even small items, and
25 staying in the same position for too long, although she also stated
26 she gets some relief from finding "a good spot and staying still."
27 (*Id.*)  She takes Ibuprofen, Flexeril, and Hydrocodone every day for
28

36 - FINDINGS AND RECOMMENDATION

1  pain, and the medications make her nauseous, dizzy, and give her a
2  headache.  (A.R. 172)

3       Douglas indicated she has trouble finishing any task that
4  requires a lot of movement.  She can only be up for five to ten
5  minutes before she has to rest.  She used to enjoy bike riding,
6  softball, riding in a boat, and going to movies, but she is no
7  longer able to enjoy these activities.  (*Id.*)  She grooms herself,
8  but requires assistance grooming the back of her hair because she
9  cannot reach behind her head.  She cleans her apartment weekly, but
10 requires assistance because lifting, pushing heavy items, and
11 certain movements are very difficult for her.  When she does go
12 out, which is rare, someone else drives her.  (A.R. 173)

13

14            *D.   Third-Party Testimony*

15       The record contains a Third Party Function Report from
16 Douglas's mother, Rita Douglas, but the first page of the report is
17 missing.  (*See* A.R. 183-90)  Mrs. Douglas indicated her daughter
18 used to be very active, working for a law firm and living "a
19 normal, productive life."  (A.R. 184)  According to Mrs. Douglas,
20 her daughter needs help dressing, bathing, caring for her hair, and
21 using the toilet.  When Douglas is in a lot of pain, she is
22 nauseous and cannot eat.  Douglas sometimes needs reminders to take
23 her medications.  She is unable to do housework without assistance
24 due to pain.  (A.R. 184-86)  Mrs. Douglas stated her daughter does
25 not go out much because it is too painful and causes motion
26 sickness.  According to Mrs. Douglas, her daughter does not handle
27 money or pay bills due to pain.  She has no hobbies or interests,
28 and has no social activities, also due to pain.  (A.R. 186-87)  She

37 - FINDINGS AND RECOMMENDATION

1  stated Douglas is unable to perform any type of activity without
2  pain, and pain affects her ability to concentrate, follow
3  instructions, and finish what she starts. (A.R. 188) She has
4  noticed that Douglas cries a lot and is "very touchy" due to her
5  pain. (A.R. 189)

6

7  **III.   DISABILITY DETERMINATION AND THE BURDEN OF PROOF**

8  **A.   Legal Standards**

9  A claimant is disabled if he or she is unable to "engage in
10 any substantial gainful activity by reason of any medically
11 determinable physical or mental impairment which . . . has lasted
12 or can be expected to last for a continuous period of not less than
13 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

14 "Social Security Regulations set out a five-step sequential
15 process for determining whether an applicant is disabled within the
16 meaning of the Social Security Act." *Keyser v. Commissioner*, 648
17 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The
18 Keyser court described the five steps in the process as follows:

19           (1) Is the claimant presently working in a
            substantially gainful activity?  (2) Is the
20          claimant's impairment severe?  (3) Does the
            impairment meet or equal one of a list of
21          specific impairments described in the regula-
            tions?  (4) Is the claimant able to perform
22          any work that he or she has done in the past?
            and (5) Are there significant numbers of jobs
23          in the national economy that the claimant can
            perform?

24

25 *Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094,
26 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d
27 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f)
28 and 416.920 (b)-(f)).  The claimant bears the burden of proof for

38 - FINDINGS AND RECOMMENDATION

the first four steps in the process. If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

The ALJ determines the credibility of the medical testimony and also resolves any conflicts in the evidence. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Ordinarily, the ALJ must give greater weight to the opinions of treating physicians, but the ALJ may disregard treating physicians' opinions where they are "conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings." *Id.*

39 - FINDINGS AND RECOMMENDATION

(citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). If the ALJ disregards a treating physician's opinions, "'the ALJ must give specific, legitimate reasons'" for doing so. *Id.* (quoting *Matney*).

The law regarding the weight to be given to the opinions of treating physicians is well established. "The opinions of treating physicians are given greater weight than those of examining but non-treating physicians or physicians who only review the record." *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir. 2003). The *Benton* court quoted with approval from *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), where the court held as follows:

> As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. We have also held that "clear and convincing" reasons are required to reject the treating doctor's ultimate conclu-sions. Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing.

*Id.* (quoting *Lester, supra*).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's subjective symptom testimony, the ALJ must engage in a two-step analysis. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Under the first step prescribed by *Smolen*,

40 - FINDINGS AND RECOMMENDATION

1
2
3
4
5
6
7

> . . . the claimant must produce objective
> medical evidence of underlying "impairment,"
> and must show that the impairment, or a combi-
> nation of impairments, "could reasonably be
> expected to produce pain or other symptoms."
> *Id.* at 1281-82.  If this . . . test is satis-
> fied, and if the ALJ's credibility analysis of
> the claimant's testimony shows no malingering,
> then the ALJ may reject the claimant's testi-
> mony about severity of symptoms [only] with
> "specific findings stating clear and con-
> vincing reasons for doing so."  *Id.* at 1284.

8  *Batson*, 359 F.3d at 1196.

9

10  ### B.  *The ALJ's Decision*

11     The ALJ found Douglas has not engaged in substantial activity

12  since her alleged disability onset date of March 3, 2006.  He found

13  she has severe impairments consisting of "mild cervical spine disc

14  herniation and cervical osteoarthritis."  (A.R. 20)  However, he

15  found her impairments, singly or in combination, do not meet the

16  Listing level of severity, including Listing 1.04, which deals with

17  spine disorders.  He indicated the evidence does not show Douglas

18  "lacks the ability to ambulate effectively or to perform gross and

19  fine movements, as contemplated by the listings." (A.R. 21)  The

20  ALJ noted the record contains evidence of periodic symptoms and

21  complaints other than those associated with Douglas's severe

22  impairments, but he found no evidence that these other symptoms

23  cause her any significant vocational limitations.  According to the

24  ALJ, "Any such impairment is not a severe medically determinable

25  impairment because no objective, acceptable medical document sup-

26  ports such a finding.  Nor does it show that it has limited his

27  [sic] work activities in any way."  (A.R. 21)

28

1    The ALJ found Douglas has the residual functional capacity
2  ("RFC") to perform light work, "with the following limitations:
3  occasional stooping, crouching, crawling, kneeling, stair climbing,
4  ladder climbing, and reaching overhead." (A.R. 21)  In arriving at
5  this RFC assessment, the ALJ found Douglas's subjective complaints
6  about the intensity, persistence, and limiting effects of her
7  symptoms "are not credible to the extent they are inconsistent with
8  the above [RFC]." (A.R. 22)  He noted that while Douglas claims
9  her daily activities are fairly limited, "it is difficult to
10 attribute that degree of limitation to [her] medical condition, as
11 opposed to other reasons." (*Id.*)

12   The ALJ found the observations made by Douglas's mother to be
13 credible, but "of limited use" in evaluating Douglas's RFC.  He
14 explained that "behavior[s] exhibited or symptoms reported by a
15 subject are not an adequate basis to establish disability." (*Id.*)
16 The ALJ noted Douglas's recent work history is limited to detailing
17 recreational vehicles and driving them to auto shows, and in 2005,
18 delivering newspapers on a part-time basis, but Douglas claimed she
19 could not perform either of these jobs due to pain. (*Id.*)  The ALJ
20 found the medical evidence does not support the degree of limita-
21 tion Douglas alleges.  In particular, he noted there are no
22 opinions in the record from Douglas's treating or examining medical
23 sources indicating she is disabled, or that she has limitations
24 greater than those found by the ALJ. (*Id.*)

25   As support for his conclusions, the ALJ noted Douglas's "MRI
26 studies and X-rays have consistently shown that [her] condition is
27 mild." (*Id.*)  The ALJ acknowledged that Douglas "has mild disc

28

42 - FINDINGS AND RECOMMENDATION

1  herniation and osteoarthritis," but none of the studies have shown
2  any impingement of her spinal cord.  (A.R. 22-23)

3       The ALJ also relied, in part, on findings that pre-date
4  Douglas's alleged onset date by two years or more.  He observed
5  that after Douglas's 2003 accident, Dr. Makker found her symptoms
6  did not correlate with the MRI findings.  (A.R. 23, citing A.R.
7  210)  In 2004, Dr. Johnson "noted 'dramatic' wincing during the
8  range of motion test and any time he touched her right arm."  (*Id.*,
9  citing A.R. 307)

10      The ALJ also noted Dr. Jacobs's indication that Douglas
11  exhibited "a lack of 'pain behavior' when he examined her in 2007."
12  (*Id.*, citing A.R. 362)  The ALJ "largely agree[d]" with the
13  analysis of the non-examining state agency consultant, whose RFC
14  assessment indicated Douglas could perform light work with the
15  limitations the ALJ included in his RFC assessment.  (*Id.*)

16      Relying on the VE's testimony, the ALJ concluded Douglas "is
17  capable of performing her past relevant work as a paralegal,
18  receptionist, general clerk, and newspaper carrier."  (*Id.*)  The VE
19  testified all four of these jobs are light or sedentary level jobs
20  that fit within the ALJ's RFC.  (A.R. 24)  The ALJ therefore found
21  Douglas was not disabled at any time from her alleged onset date
22  through November 4, 2009, the date of his decision.  (*Id.*)

23

24                    **IV.   *STANDARD OF REVIEW***

25      The court may set aside a denial of benefits only if the
26  Commissioner's findings are "'not supported by substantial evidence
27  or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.*
28  *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*

43 - FINDINGS AND RECOMMENDATION

1  *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*

2  *V. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1

3  (9th Cir. May 20, 2011).  Substantial evidence is '"more than a

4  mere scintilla but less than a preponderance; it is such relevant

5  evidence as a reasonable mind might accept as adequate to support

6  a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,

7  1039 (9th Cir. 1995)).

8      The court "cannot affirm the Commissioner's decision 'simply

9  by isolating a specific quantum of supporting evidence.'"  *Holohan*

10 *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*

11 *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court

12 must consider the entire record, weighing both the evidence that

13 supports the Commissioner's conclusions, and the evidence that

14 detracts from those conclusions.  *Id.*  However, if the evidence as

15 a whole can support more than one rational interpretation, the

16 ALJ's decision must be upheld; the court may not substitute its

17 judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v.*

18 *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

19

20                    *V. DISCUSSION*

21     Douglas argues the ALJ erred in finding, at step two of the

22 sequential evaluation process, that Douglas has only a "mild" disc

23 herniation and osteoarthritis.   She argues this finding was

24 erroneous, and ignores her "multi-level foraminal stenosis and

25 central spinal canal narrowing." Dkt. #21, p. 5.  Douglas claims

26 this error was significant because the ALJ premised his credibility

27 assessment on the finding that Douglas's spinal condition was only

28 "mild."  *Id.*

The Commissioner argues the ALJ's failure to specify that Douglas's severe impairment included her foraminal stenosis and spinal canal narrowing did not prejudice Douglas "because the ALJ resolved step two in her favor." Dkt. #26, p. 5.  He notes the step two analysis is considered a "'de minimis screening device to dispose of groundless claims.'" *Id.* (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)).  Here, the ALJ found that Douglas has a severe impairment involving disc herniation and osteo-arthritis of her upper back.  The ALJ, therefore, continued his analysis through steps three and four of the sequential analysis. Because the ALJ resolved step two in Douglas's favor, the Commis-sioner argues the proper focus of the inquiry should be "whether substantial evidence supports the ALJ's RFC assessment."  *Id.*

I agree with Douglas that her back condition is more than "mild."  MRI findings in June 2007 indicated the presence of "[a]dvanced asymmetrical degenerative disk disease" at C5-6, and less severe disk disease at C6-7. (A.R. 364; emphasis added)  The ALJ cited MRI findings from 2003 and 2005 in support of his conclusion that Douglas's disc disease is "mild." (*See* A.R. 20) His consideration of this medical evidence that significantly pre-dates Douglas's alleged disability onset date was erroneous. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) ("[m]edical opinions that predate the alleged onset of disability are of limited relevance"); *Burkhart v. Bowen*, 856 F.2d 1335, 1340 n.1 (9th Cir. 1988) (ALJ correctly rejected medical evidence as "not probative," because, *inter alia*, it predated "the relevant time period"); *accord Ingham v. Astrue*, 2010 WL 1875651, at *3 (C.D. Cal. May 10, 2010) ("medical opinions of any physician,

45 - FINDINGS AND RECOMMENDATION

treating or examining, which predate the alleged onset of disabili-
ty are not considered substantial evidence") (citing *Carmickle*);
*Lewis v. Astrue*, 2011 WL 1085254, at *8 (D. Or. Feb. 15, 2011)
(Sullivan, M.J.) (same).

Nevertheless, although it may seem contradictory for the ALJ
to find that a "mild" cervical spine condition constitutes a
"severe" impairment, he did reach that conclusion, and he resolved
step two in Douglas's favor.  Thus, to the extent he erred in
describing Douglas's condition as "mild," or in failing to mention,
specifically, her foraminal stenosis and spinal canal narrowing,
the error was harmless.  *See Carmickle*, 533 F.3d at 1162 (ALJ's
error is harmless if it is "'inconsequential to the ultimate
nondisability determination'"; quoting *Stout v. Comm'r, Soc. Sec.
Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006)); *accord Sims v.
Astrue*, slip op., 2012 WL 364055, at *4 (D. Or. Feb. 2, 2012)
(Haggerty, J.) (quoting *Carmickle*).

Douglas also argues the ALJ erred in finding her subjective
complaints to be less than fully credible.  In a related argument,
she asserts the ALJ's RFC determination was erroneous because it
did not include all of the limitations established by the evidence
of record.  Douglas argues the ALJ failed to cite clear and con-
vincing reasons for rejecting her testimony, and also, as above, in
citing medical evidence pre-dating her alleged disability onset
date by "several years."  Dkt. #21, p. 8.

The Commissioner argues the ALJ's RFC finding and credibility
assessment are supported by substantial evidence and should be
affirmed.  The Commissioner points to various "evidence" cited by
Douglas in her brief, arguing Douglas actually is relying on her

46 - FINDINGS AND RECOMMENDATION

1  own reports of her symptoms, and treating them as "medical

2  findings." Dkt. #26, pp. 7-8.

3     I find the ALJ properly supported his credibility finding and

4  his RFC assessment.  It may be inappropriate for an ALJ to consider

5  medical evidence that predates a claimant's alleged onset date for

6  purposes of establishing the date of disability. *See Carmickle,*

7  *supra*; SSR 83-20.  Here, however, the ALJ pointed to instances in

8  Douglas's pre-onset-date records that suggest she makes subjective

9  complaints that are not fully credible.  In August 2003, Dr. Makker

10 noted the radiologist who performed an MRI study of Douglas's

11 cervical spine in 2003, had found a lack of correlation between the

12 area of Douglas's back where she complained of symptoms, and the

13 area of disc protrusions at C5-6 and C6-7, to the left side, as

14 shown on the MRI study.  In other words, Douglas's complaints were

15 inconsistent with the objective examination findings, at least sug-

16 gesting some question regarding the credibility of her complaints.

17 Dr. Makker agreed with the radiologist.  The following year,

18 Dr. Johnson observed that Douglas winced dramatically during his

19 range-of-motion testing, and whenever he touched her right arm.  He

20 therefore expressed some doubt as to the validity of his examina-

21 tion, indicating it was "difficult to assess" whether Douglas was

22 giving her full effort during the exam. (A.R. 307)  Although these

23 records predated Douglas's alleged onset date, they are useful in

24 evaluating her overall credibility. *See, e.g.*, *Smolen v. Chater*,

25 80 F.3d 1273, 1284 (9th Cir. 1996) (in evaluating credibility, ALJ

26 may consider a claimant's "prior inconsistent statements concerning

27 [her] symptoms"); *see also Carmickle*, 533 F.3d at 1162 (noting that

28 even if some of ALJ's analysis is erroneous, credibility

determination will be upheld if it is supported by substantial evidence).

In addition, the ALJ did not stop with these earlier indications that Douglas's subjective complaints may not be fully credible.  Other evidence the ALJ cited to support his adverse credibility determination includes the following:

1.  In January 2007, Dr. Paul Jacobs treated Douglas with a trigger point injection for her chronic back pain, and referred her to a pain clinic.  However, he noted Douglas displayed "no pain behavior during her physical examination or her interview."  (A.R. 356)

2.  The ALJ noted Douglas obtained "some relief" from epidural injections; Flexeril helps relieve her muscle spasms; she takes Neurontin and Ibuprofen regularly for pain.  (A.R. 23)  "A conservative course of treatment can undermine allegations of debilitating symptoms." *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995); *accord Carmickle*, 533 F.3d at 1162; *Adams v. Astrue*, slip op., 2011 WL 6965470, at *3 (D. Or. Dec. 8, 2011) (Acosta, M.J.).

3.  The ALJ noted Douglas saw doctors for complaints of pain in her back, neck, and leg after trip-and-fall incidents in late 2008 and June 2009.  Douglas "indicated that the most recent fall caused right lower leg numbness and pain in her toes."  However, "the medical evidence does not contain objective evidence of her condition worsening," and Douglas acknowledged that "wearing flip-flops regularly may be causing toe pain."

48 - FINDINGS AND RECOMMENDATION

1        (A.R. 23)   The ALJ also noted x-rays after Douglas's 2008

2        fall were "normal, and there were no further studies

3        after the 2009 incident."  (*Id.*)

4        Thus, the ALJ noted substantial evidence that contradicts

5   Douglas's claim that she is disabled.  The court "will not reverse

6   credibility determinations of an ALJ based on contradictory or

7   ambiguous evidence."  *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th

8   Cir. 1995) (upholding credibility determination where ALJ

9   "identified several contradictions between claimant's testimony and

10  the relevant medical evidence and cited several instances of

11  contradictions within the claimant's own testimony").

12       Douglas also argues the ALJ erred in rejecting the lay witness

13  testimony from Douglas's mother.  *See* Dkt. #21, pp. 12-14.  The ALJ

14  noted that Mrs. Douglas indicated she helps her daughter with

15  laundry and other tasks, and she has observed that Douglas "is in

16  constant pain and is no longer able to pursue enjoyable activities

17  such as athletics."  (A.R. 22)   The ALJ found Mrs. Douglas's

18  testimony to be credible, but "of limited use," because "behavior

19  exhibited or symptoms reported by a subject are not an adequate

20  basis to establish disability."  (*Id.*)   In other words, the ALJ

21  found Mrs. Douglas's statements simply repeated her daughter's

22  complaints.   Mrs. Douglas offered no further observations or

23  examples of Douglas's alleged limitations.   Having properly found

24  Douglas not to be fully credible, it was proper for the ALJ not to

25  credit her mother's repetition of Douglas's complaints.   The ALJ

26  gave a proper reason germane to Mrs. Douglas's statement for

27  finding her statements to be of only limited use.   *See Lewis v.*

28  *Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (citations omitted) (ALJ

49 - FINDINGS AND RECOMMENDATION

may discount lay testimony that conflicts with medical evidence, where ALJ gives "at least noted arguably germane reasons for dismissing the family members' testimony").[10]

## V.  CONCLUSION

For the reasons discussed above, I recommend the Commissioner's decision be affirmed.

## VI.  SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due by **September 14, 2012**. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.  If objections are filed, then any response is due by **October 1, 2012**.  By the earlier of the response due date or the date a response is filed, the Findings and Recommendations will go under advisement.

IT IS SO ORDERED.

Dated this <u>28th</u> day of August, 2012.


/s/ Dennis J. Hubel
_____
Dennis James Hubel
Unites States Magistrate Judge

---

[10]I further note Mrs. Douglas's statement actually contradicts her daughter's, in one respect.  Douglas indicated she can handle her own money, pay bills, etc., while her mother stated Douglas cannot do these things because of pain.  *Compare* A.R. 166 *with* A.R. 186.

50 - FINDINGS AND RECOMMENDATION